JAMES R. WOOLDRIDGE, Appellant, v. P. TAYLOR
BRYAN, Administrator of Estate of ANNIE W.
RAPLEY, Appellant.

Division One, March 16, 1925.

1. **LIMITATION: Notes: Payment of Interest.** The payment of in-
terest, and not its indorsement on the note, is the material fact in
determining whether the note is barred by the Statute of Limita-
tions; and testimony from which it can be reasonably inferred that
the deceased maker admitted the payment of interest about the
date of a notation on the note of interest paid, in the handwriting
of another, is sufficient evidence to sustain a verdict for the payee
on the issue whether there had been such a payment of interest as
saved the note from the bar of the statute.

2. ———: ———: ———: **Notation by Another.** Notations on the
back of notes of interest paid made by another at the maker's di-
rection is the same as if the maker himself had made the notations.

3. ———: **Drawn in Another State.** Notes which on their face are
contracts of another state will not be held to be barred by the
statutes of such state unless such statutes are pleaded and proved,
but if neither pleaded nor proved the laws of this State govern.

4. **CHECKS: Presentation: Loss: Negotiable Instrument Law.** Under
the statute (Sec. 972, R. S. 1919) failure to present a check for pay-
ment within a reasonable time does not discharge the check ab-
solutely; it discharges it only "to the extent of the loss caused by
the delay," and if no loss is pleaded or shown by the evidence it
cannot be ruled that failure to present it for payment during the
life of the drawer is a discharge.

5. ———: ———: ———: ———: **Sections Construed Together.** Sec-
tion 856, providing that presentation is not necessary in order to
charge the person primarily liable on the instrument, but if pay-
able at a special place and he is able and willing to pay it there at
maturity such ability and willingness are equivalent to a tender of
payment, "but except as herein otherwise provided presentment for
payment is necessary in order to charge the drawers and in-
dorsers," and Section 929, specifying the place of presentment and
providing that "in no other case is presentment for acceptance
necessary in order to render any party to the bill liable," do not
excuse the administrator of the estate of a deceased drawer of a
check, drawn in this State in favor of a payee in another state,

from paying it, but prevent a discharge of the check by a failure to present it for payment within a reasonable time. But in addition to the words of those two sections the "otherwise" provision of Section 856, and the words "except as herein otherwise provided" found in Section 971, refer to the words "to the extent of the loss caused by the delay" arising from failure to present it within a reasonable time found in Section 972. And when all these sections are considered together they mean that unless there is a loss occasioned by the failure to present the check for payment within a reasonable time after its maturity it is not discharged.

6. **ACCOUNT: Money Advanced for Board and Nurses.** The administrator is liable to a son for the amount he paid for his deceased mother's board at another's apartment, and for the amount he paid to nurses for her, procured by the direction of her physician, and for the value of the board of such nurses at her said apartment and after she had been removed to his house, where the amounts are not disputed and the payments to the nurses were made pursuant to an understanding between him and her and such understanding is established by her admissions.

7. ———: **Board of Mother at Son's House.** Unless it appears to the contrary, a son is not presumed to intend to charge for the board and lodging of his mother in his own home. Recovery from the administrator for the value of board and room furnished by a son to his mother cannot be based alone upon her expressed intention to pay for same; it must also be shown that he intended to charge her therefor. And where he made no such charge in her lifetime, and after her death wrote that he "had no thought of making charge for her upkeep," but his good name having been besmirched by his sister he had concluded to "hew to the line and file my claim for the full amount of all expenditures by me and on account of my mother's upkeep, comfort and pleasure," the verdict of the jury finding against him in the amount claimed for her board at his house will not be disturbed on appeal. But on the other hand, such letter will not be construed as an expressed intention not to charge her for the services of her nurses paid by him, or for their board at his house while serving her, or for her board elsewhere paid by him.

8. ———: **Chauffeur.** A verdict for the administrator on the claim of a son for the value of a chauffeur for his deceased mother while she made her home at his house will not be disturbed on appeal, where the evidence was conflicting as to whether the chauffeur's services were solely for her and at her request, or for her as a member of the son's family.

9. **EVIDENCE: Letter: Explanation.** It is not error to refuse to permit the claimant against an estate to explain a letter written by him, after decedent's death, pertaining to his claim against her estate, where its language is plain and unequivocal.

Citations to Headnotes: 1 and 2, Limitation of Actions, 37 C. J. 630, 782; 3, Evidence, 22 C. J. 87; Limitation of Actions, 37 C. J. 718; Statutes, 36 Cyc. 1240, 1252; 4, Bills and Notes, 8 C. J. 758; 5, Statutes, 36 Cyc. 1147; 6 and 7, Executors and Administrators, 24 C. J. 887, 1122, 881, 882; 8, Appeal and Error, 4 C. J. 2836; 9, Evidence, 22 C. J. 1570.

Appeal from St. Louis City Circuit Court.—*Hon. Charles W. Rutledge,* Judge.

AFFIRMED.

*Lubke & Lubke* for claimant.

(1) The plaintiff by undisputed evidence showed an express agreement between his mother and himself to pay for her board and lodging and to reimburse him for outlays for nurses and attendants and the services of a chauffeur, as well as the repeated acknowledgments of this contract by his mother. Having obtained verdicts and judgments for the sums paid for nurses and attendants, he was also entitled to verdicts for the value of the board and lodging and the sums paid to the chauffeur. The verdicts in favor of the plaintiff on the second, third, fourth and fifth counts of the sixteenth claim are correct, both under the evidence and the law. Burt v. Gabbert, 174 Mo. App. 521; Hartley v. Hartley's Estate, 173 Mo. App. 18; Hyde v. Honiter, 175 Mo. App. 583; Biggerstaff v. Riley, 192 Mo. App. 92; Stone v. Troll, 134 Mo. App. 308; Rouden v. Heisler's Estate, 219 S. W. 691; Cole v. Fitzgerald, 132 Mo. App. 17. (2) Defendant's Instruction 20 is erroneous. It ignores the proof of the express contract on the part of the deceased to pay for her board and lodging and is therefore misleading. It should not have been given. Botts v. Railroad, 180 Mo. App. 368; Cytron v. Transit Co., 205 Mo. 692; Stone v. Hunt, 94 Mo. 475; State ex rel. v. Central Coal & Coke Co., 270 Mo. 645. (3) Defendant's Instruction 19 is

Wooldridge v. Bryan.

erroneous in that it required the credits to be endorsed on the notes by the deceased in order to make them an acknowledgment of an existing indebtedness, whereas it is sufficient if the endorsement of the credits be made at the direction of the deceased, which the proof showed. Gardner v. Early, 78 Mo. App. 346; Haver v. Schwyhart, 39 Mo. App. 303; Wright v. Wayland, 188 S. W. 928. (4) The trial court erred in refusing to allow the plaintiff to explain his letter to Washington Byler. At most this letter was an admission against interest and subject to explanation. Buick v. Insurance Co., 194 Mo. App. 529; Casella v. Insurance Co., 175 Mo. App. 130; Chamberlain v. Iba, 181 N. Y. 486. (5) The indorsement of the credits on the first six notes sued on having been made at the direction of the deceased by a third party in her presence, the fact of the payments made on the notes having been admitted by the deceased, these notes were not barred by the Statute of Limitations. Gardner v. Early, 78 Mo. App. 346; Haver v. Schwyhart, 39 Mo. App. 303; Wright v. Wayland, 188 S. W. 928; Henry v. Devinney, 101 Mo. 378. (6) The court properly refused defendant's instruction. The notes on their face import a consideration. There is no evidence that at the time they were executed the deceased lacked mental capacity sufficient to enter into contracts. Besides, want of consideration is a defense which must be proved by the defendant. Home Bldg. & Loan Assn. v. Barrett, 141 S. W. 723. (7) By statute a check is made a bill of exchange drawn on a bank payable on demand. R. S. 1919, sec. 971. Presentment for payment is not necessary to charge the maker. R. S. 1919, sec. 856. A check being a negotiable instrument imports a consideration, and even if the drawer be dead before the check is presented for payment to the bank upon which it is drawn, the liability of the drawer to pay is in no wise altered, notwithstanding the death of the drawer revoked the bank's authority to pay. Fisher v. Bagnell, 194 Mo. App. 581.

*Leland A. Wind* for administrator.

(1)    The indorsement of credits on the notes con-
stituting claims 1 to 6, both inclusive, is not sufficient evi-
dence of such payments to avoid the bar of the Statute
of Limitations, not being signed by the deceased, nor in
her handwriting. It is the payment and not the indorse-
ment of credits or other admissions not signed by her
which would prevent the running of the statute. Elzer
v. Prior, 87 Mo. App. 161; Henry v. Devinney, 101 Mo.
378; Regan v. Williams, 185 Mo. 620, 631; Meffert v.
Lawson, 233 S. W. 37.    (2)    Under the testimony show-
ing the confidential and intimate family relationship be-
tween claimant and the deceased, together with the doc-
tor's testimony regarding her mental and physical con-
dition, the court should have given the instruction asked
by defendant, requiring the jury to find that defendant
received full value of all of the notes and that they rep-
resented an actual indebtedness due and unpaid before
finding for the claimant on any of the thirteen notes.
(3)    A check is not a cause of action without proof that
it was presented for payment to the bank on which it
was drawn and payment refused.    Adams v. Early, 28
Mo. 162; Myers v. Bank, 72 Mo. App. 4.    (4)    The letter
written by claimant to Washington Byler under date of
November 11, 1911, shows conclusively that he had no
intention of charging deceased or her estate for the
board and lodging of her attendants, and when a plain-
tiff flatly denies the chief element which constitutes his
cause of action he cannot recover.    Crowley v. Dagley,
174 Mo. App. 566.    (5)    The verdict of the jury was man-
ifestly against the evidence and the weight of the evi-
dence, and inasmuch as the testimony was entirely in the
form of depositions this court is in a better position to
weigh the evidence than the trial court was.    The jury
should have been instructed to find for the defendant on
the entire sixteenth claim, as requested by the defend-
ant.    Clow v. Wormington, 206 S. W. 415; Smith v. Davis
Estate, 230 S. W. 670; Burt v. Gabbert, 174 Mo. App. 527;

Morrison v. Morrison, 197 Mo. App. 527.; Crowley v. Dagley, 174 App. 566. (6) Letters of a deceased, even though not against her interest, are admissible to disprove material admissions alleged to have been made by her against her interest.

GRAVES, J.—This case originated in the Probate Court of the City of St. Louis. Plaintiff is the son of Annie W. Rapley, deceased, who left an estate in the city of St. Louis, and filed a claim in said court against this estate. The claim was based upon thirteen notes, two checks, and the following stated account:

"Mrs. Annie Washington Rapley

To James R. Wooldridge, Dr.

"To Board and lodging from Oct. 1st, 1916, to Aug. 30, 1919, at $45.00 per mo. .................................$1,560.00

"To Wages paid Miss Blanche Bean as nurse and attendant, Nov. 17, 1916, to April 4th, 1917, at your request   300.00

"To board of Miss Bean at $30.00 per mo., furnished at your request ......   138.00

"To wages paid Miss Lillian Frazier as nurse and attendant, Apr. 4, 1917, to Aug. 21, 1919, at your request. ..............................   1,695.00

"To board of Miss Frazier at $30.00 per month, furnished at your request ..............................   857.00

"To wages paid Joe Thomas as chauffeur, June 4, 1919, to Aug. 20th, 1919, at your request. ...........   141.28

"$4,691.28"

The said probate court allowed the plaintiff the full amounts of the several items of his claim, and the administrator appealed to the circuit court. Upon trial in the circuit court before a jury the plaintiff had a verdict for all of the items of his claim, except items one

and five of the stated account, supra. Judgment was entered upon this verdict and both sides have appealed.

In a way the whole judgment in favor of plaintiff is challenged in the appeal by the administrator. The plaintiff challenges it upon the two items mentioned, supra, wherein the jury disallowed these items by their verdict. In point five of defendant's brief, the counsel for said appellant gives a resume of his real complaints thus:

"The court erred in refusing to give peremptory instructions to find for the defendant on each of the following claims:

"1. The first six notes bearing endorsements of interest credits dated May 11, 1911.

"2. The two checks bearing date of April 15, 1918, and November 4, 1918, for two hundred dollars each, respectively.

"3. The claims for moneys paid to Blanche Bean for wages and board.

"4. The claim for moneys paid to Miss Frazier for wages and board."

There are also complaints as to instructions, and the admission of evidence. This outlines the case, and the details are left to the opinion.

I. The claimant in this case is a man of considerable means, and the son of deceased, Annie W. Rapley. He has lived in Tennessee for many years, as we gather from the evidence. Some years before her death the deceased, who owned some considerable property (real estate) in St. Louis and Sedalia, made her home in Tennessee. For some years she lived in the Marion Apartments, paying at all times her own expenses. From statements she made to divers witnesses, this son always helped her financially, when her rents failed her, or occasion required, and she gave him notes. These cover a long period of years. So long was the period of years that the first six or seven would be barred by the Stat-

*Limitations: Payment of Interest.*

utes of Limitation, but for credits on each of them in 1911.

There is no question as to the bona fides of the notes, but it is denied that the payments of interest in 1911 were in fact not made and the notes were therefore outlawed by the statute. The testimony shows that in 1911, at or about the date of these credits, the claimant came to the room where his mother, Miss Jennie Boyd and a Mrs. Sudberry were sitting and that he handed to his mother some papers, and said to her that he had marked, in pencil, the amount of interest upon each note, and for her to put such payment in ink upon the notes. The mother did not have her glasses, and directed Mrs. Sudberry to enter the credits in ink upon the notes, and the evidence further shows that the credits were in the handwriting of Mrs. Sudberry. Then the evidence of another witness, J. B. Brickey, of Wooldridge, Tennessee, is to the effect that Mrs. Rapley visited Wooldridge every summer, and that he saw her and talked to her in 1912, when she was on a visit to Wooldridge. His testimony is as follows:

"Q. What was the gist of your conversation with Mrs. Rapley on that visit? A. She was telling me of her losses in the fire, stating that she had lost some two or three thousand dollars worth of property, including heirlooms, clothing, etc., and that she had had to replenish her stock of such personal effects as she needed, and that she had gotten this money from her son, James R. Wooldridge, amounting to one thousand dollars; that if it had not been for his kindness in advancing money she would have been in a pretty bad condition.

"Q. Did she state to you in that same conversation anything about any other money that she may have owed her son, and if so, what was the evidence of that money? A. She stated that among her losses was a memorandum that she had of some notes that her son, James R. Wooldridge, held of hers.

"Q. Did she say to you what the notes stood for, whether it was money advanced or property, or why she had given the notes? A. No, she did not state; she said

he held those notes; and she had lost the memorandum of them showing the interest paid on the notes; I called her attention to the fact that that would not be material inasmuch as Colonel Wooldridge had the notes, and they would show, themselves, such payments.

"Q. Did she state how many notes she owed at that time? A. No, sir; she said the amount was two thousand dollars.

"Q. That is to say, the notes that her son held against her was for two thousand dollars. A. Yes, sir.

"Q. Did she state to you, or did she mention anybody's name as having done anything to those notes; and if so, who was the person to whom she referred?

"Mr. Wind: Your Honor, I am objecting to the answer to that question and ask that it may be stricken out as immaterial and incompetent.

"The Court: The objection is overruled.

"Mr. Wind: Save my exceptions."

(Mr. Lubke marking on deposition).

"Mr. Lubke (continuing reading): "Q. Did she state to you, or did she mention anybody's name as having done any thing to those notes; and if so, who was the person to whom she referred? A. She said that the interest had been paid about a year before and that Mrs. Sudberry had attended to the notation of the interest payment on the notes."

The effect of this evidence is that Mrs. Rapley admitted the payment of interest on the notes in 1911, and that she had Mrs. Sudberry make the notation on the back of the notes. All this evidence when taken together is such that a jury could very properly infer that Mrs. Rapley had in fact paid interest on these in 1911, about the time that Mrs. Sudberry made the notations on the notes at her request. The law of this State makes the payment of the interest, and not the indorsement on the note, the material fact in determining the question as to whether or not the note is barred by the statute. We therefore have no criticism of the cases cited by appellant upon this point. The amount of the outstanding

notes at that date appears from the record, before us, as it did before the jury. The maker of the notes admits that she paid interest in 1911, and all the other circumstances tend to show that the admission was well founded, and that there was, in fact, actual payment of interest on these notes in 1911. The jury was warranted in finding that fact from the evidence, and we will not disturb their findings.

But in addition to this the evidence shows that the notations were made by Mrs. Sudberry at the maker's direction. This is, as if the maker of the notes had made the notations herself. Had the fact appeared that notations of interest payment was in the handwriting of deceased, the jury could well find that she thereby admitted the payment of interest on that date. However, what we have said, supra, covers the case.

II.  The next complaint is as to the two checks of $200 each.  The genuineness of the checks are not disputed.  They are shown, so far as the signature is concerned, to be in the handwriting of the deceased.  It **Checks:** further appears that on the very same dates **Presentation.** Colonel Wooldridge gave the deceased two checks of $200 each which she cashed at the bank.  The dates of Mrs. Rapley's checks to Wooldridge are, respectively, April 10th, and November 4th, 1918.  The checks of Colonel Wooldridge to the mother were of like dates respectively.  At least, they were made to her, and her name was on the back thereof, and they were paid.  It may be that she was temporarily exchanging checks.  This is not very material, however. The contention here is that the checks cannot be allowed now, because they were not presented for payment.  We are cited to two cases, i. e. Adams v. Darby and Barksdale, 28 Mo. 162, and Myers v. Bank, 72 Mo. App. 4. These cases are long prior to our Negotiable Instrument Law.  [Laws 1905, p. 243, now Arts. I, II and III, Chap. 7, R. S. 1919.]

The plaintiff claims that this Negotiable Instrument Law has rendered obsolete some of our previous decisions, and that under it the claim of the payee in these checks is valid against the maker or her estate. The dates of the checks we have indicated above. Mrs. Rapley, the maker, died August 20, 1919.

Under the Negotiable Instrument Law, Revised Statutes 1919, Section 971, a check and its status is thus defined:

"A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this chapter applicable to a bill of exchange payable on demand apply to a check."

The following section (Sec. 972, R. S. 1919) says:

"A check must be presented for payment within a reasonable time after its issue or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay."

So it would appear that failure to present within a reasonable time does not absolutely discharge the drawer from liability. He is only discharged "to the extent of the loss caused by the delay." In this case the administrator stands in the shoes of the drawer. He can claim no greater right than the drawer had. He claims no loss by reason of delayed presentment. The delayed presentment occasioned no loss to deceased or her estate. In fact the exchange of checks upon the two respective dates of the checks in suit would strongly indicate that the mother was getting the cash from the son (for she got the money on his checks) and expected the son to hold her checks. But aside from this, the section of the statute, supra, uproots the old rule, if it ever had substantial effect (as between the drawer and the payee) in the matter of prompt presentation of a check. This is an action against the drawer of these checks, which checks under our law are negotiable instruments. We say against the maker, because the administrator stands in the shoes of the drawer. The first four of the six notes are Missouri contracts upon their face. The seventh

note was dated January 16, 1911, and the claim was filed January 6, 1920, so our statute would not bar it.

The substantial contention as to the Statute of Limitation refers to the first six notes, and of them, as said, the first four are Missouri contracts, and of course governed by our law. As to the other two, which on their face are Tennessee contracts, no Tennessee statutes are pleaded or proven, hence the law of the forum applies. In such case we assume that in this respect the laws of Tennessee are the same as ours. Under Section 972, Revised Statutes 1919, the failure to present only entitles the drawer to such damages as may have been occasioned by the failure. None are claimed and none are proven. Even under the old rule, as to negotiable notes, it has been said: "If he was suing the maker instead of an indorser, his instruction might have been given, because the maker of a note is liable whether there be any demand of payment or not." [Napper v. Blank, 54 Mo. l. c. 134.] Under the Negotiable Instrument Law, Chapter 7, Revised Statutes 1919, this matter is covered. Thus Section 856, Revised Statutes 1919, reads:

"Presentment for payment is not necessary in order to charge the person primarily liable on the instrument; but if the instrument is, by its terms, payable at a special place, and he is able and willing to pay it there at maturity, such ability and willingness are equivalent to a tender of payment upon his part. But except as herein otherwise provided, presentment for payment is necessary in order to charge the drawers and indorsers."

And under Article II of the same chapter, dealing with Bills of Exchange, it is in Section 929, Revised Statutes 1919, further said:

"Presentment for acceptance must be made: (1) Where the bill is payable after sight, or in any other case where presentment for acceptance is necessary in order to fix the maturity of the instrument; or (2) where the bill expressly stipulates that it shall be presented for acceptance; or (3) where the bill is drawn

payable elsewhere than at the residence or place of business of the drawee. *In no other case is presentment for acceptance necessary in order to render any party to the bill liable.*"

These checks fall under the last sentence of this section, if as a fact, they are not fully covered (as we think they are) by Section 972, supra. We say they are fully covered by Section 972, because Section 971 says "except as herein otherwise provided, the provisions of this chapter (Chapter 7, supra) applicable to a bill of exchange payable on demand apply to a check." The "otherwise" provision is Section 972, which provides that a check must be presented in a reasonable time, but which also says that if there is a failure to so present the drawer is discharged from liability thereon only "to the extent of the loss caused by the delay."

In this case there was no loss occasioned by the delay. The checks primarily import a consideration and want of consideration is not pleaded or proven. So, all laws considered, the judgment as to these checks should be sustained.

III. We now reach the sixteenth item of the claim, which is the stated account fully set out in our statement, supra. There is a mass of testimony as to statements made by the deceased, to the effect that she had sufficient means and estate to be independent Account for and wanted to be independent; that she had Board and arranged with her son to advance her all moneys which might be necessary for her comforts in her old age (and she was a very old woman when she went to his home in the Kincaid Apartments), and that she was to repay him for all he paid out for her. In other instances she said that if she could not pay, her estate was good for it. She had a physician of her own choice, Dr. Ben B. Cates, and it was he who told her that she must have a nurse to look after her. The two nurses mentioned in the claim, supra, were procured under the direction of her physician, and the son only

paid their bills pursuant to the expressed understanding admitted by the mother. The amounts are not disputed. The liability is the only question, and this is settled by the overwhelming proof of the mother's admission as to the understanding between her and her son. It was broad enough to cover her personal board and room, because it is proven that she said that she was paying $65 per month at the Marion Apartments, and that sum would cover her expenses at the Kincaid Apartments with her son. At the Marion Apartments she got room and board, and this she got, through the son, at the Kincaid Apartments. Under all the evidence, the details of which would serve no purpose, the jury was fully authorized to find for claimant upon the items upon which they did find, and the judgment, so far as the appeal of the administrator is concerned, must be affirmed.

IV. This brings us to the appeal of the claimant. This covers the first and last items in the stated account. The first item is $1560 for the board and lodging of deceased in claimant's rooms at the Kincaid Apartments, and the last is $148.28 for a chauffeur. The first item was evidently disallowed by the jury by reason of a letter which claimant wrote to a nephew. His sister (Mrs. Byler) was not upon good terms with claimant. She seems to have annoyed him, but be this as it may, they were not friendly. The claimant wired the nephew (Washington Byler) at his home in Chicago of the death of his grandmother. On November 11, 1919, he wrote a letter to the nephew. The whole of the letter must be considered, and it reads:

"Wooldridge, Tenn., Nov. 11th, 1919.
"Dear Washington:
    "Your letter of the 5th at hand, and I was glad to hear from you.
    "Your Woodlawn Avenue, Chicago, Ill., address was the only one I had, hence, I used it in wiring you of my Mother's passing and also directed two letters and two newspapers to you there.
    "My Mother died while I was from home, and I telegraphed you at Chicago within an hour after I learned of her death.
    "Mrs. Byler has been at Knoxville for a couple of weeks and is still there so far as I know.

"My Mother's trunk, black leather hand-satchel, together with the wearing apparel and articles closely associated with her, but having but little value aside from the association, by agreement by all the heirs have been delivered to Mrs. Byler.

"Mrs. Byler has demanded of me and also through the administrator that I produce a will which she claims my mother made and that I deliver certain articles belonging to the estate and other articles belonging to Mrs. Byler, which she claims are missing. The facts are, this is the first I heard of my mother having made a will and if there was or is one I have not seen it, nor have I heard any one except Mrs. Byler refer to it. I have never had possession of any property belonging to either my Mother or Mrs. Byler.

"Two experiences more than twenty-five years ago satisfied me that I wanted nothing to do with Mrs. Byler, under any circumstances or conditions and there is no probability of me changing my mind on that subject. Knowing her made me cautious in any matter having the possibility of bringing me in contact with her. It is my misfortune and not my fault I am in contact with her now for following that policy I refused to handle money for my mother's account, transact business for her or to take charge of anything belonging to her. My Mother attended to her affairs and had charge of her belongings up to her death.

"She died at my house and her personal effects were gathered up and everything not delivered to Mrs. Byler was turned over to the administrator. On inquiry I am advised that none of the articles, claimed by Mrs. Byler as missing, have been seen or heard of since prior to my Mother making her home with me.

"During the last several years of her life I contributed liberally in time, effort and money to make my Mother comfortable considering same my duty, and at the same time a pleasure.

"I did these things with no thought of making charge for her upkeep, as I have reached the stage where a few thousand dollars more or less counts for but little with me.

"If I am to be hounded, persecuted and the besmirching of my good name attempted concerning things I know nothing of, and had nothing to do with, then it would be best that I hew to the line and file my claim for the full amount of all expenditures by me and on account of my Mother's upkeep, comfort, and pleasure.

"I have written you fully concerning this matter for the reason that your letter and the success you have met with in life indicate you are a man of sense and judgment, hence, know a woman's virtue and a man's honor are priceless jewels to be valued above all else, and protected at all cost.

"This is the third time Mrs. Byler has without cause, reason, or justification struck at the very tap root of my reputation. A little of that is more than enough for anyone to stand, and if Mrs. Byler continues her course in the matter I shall not hesitate to prosecute her criminally,

"Sincerely, your uncle,<br>
"JAS. R. WOOLDRIDGE."

It is upon the latter portion of this letter, that the administrator sought to defeat the whole claim in the stated account. While the deceased always stated that

she had arranged with the son to pay for all necessary expenditures in her behalf, and he was to be repaid for same, yet it does not appear clearly in these admissions that he and she had agreed that he should be recompensed for her room and board in his home. It does appear that she intended to pay, but not that he intended to charge. She often said that she paid $65 per month at the Marion Apartments, and intended that the son should have that amount. Such, however, is not within the specific admitted agreement with the son as to advancements to be made for her requirements. This letter says that he felt constrained to file a claim for the *full* amount. The letter does not say that he would not file for the expenses he paid for nurses and board of nurses, who stayed with the mother from the time her doctor engaged them, up to the time of the death.

It is true, that unless it appears to the contrary, the son who has an aged mother in his home, is not presumed to have an intention to charge for her board and lodging. Of course he could contract for pay, or if it appeared clearly that he intended to charge, and the mother intended to pay, we would have a different case. As to this particular item, we only have the statements of the mother that she expected to pay, and for her son to have, what she paid at the Marion Apartments. It is an item which the jury could find was not within the admitted arrangement to pay the mother's expenses. The items as to the nurses are upon a different basis. We say the jury could well find, considering the letter, and all other evidence, that the son did not intend to charge for the mother's room and her board. Her nurses and her doctor would be upon a different plane, and controlled by a different rule of law.

As to the last item (the charge for the chauffeur) the evidence is somewhat conflicting, as to whether his services were purely for the mother, and at her request, or a service for her as one of the family.

Counsel for claimant asked that he be permitted to explain his letter, set out in full, supra. The language

is plain and unequivocal, and no error was committed in refusing an oral explanation.

In view of all the facts, we conclude that both parties have had a fair trial, and that the judgment should be and is affirmed.. All concur, except *Atwood, J.,* not sitting.